[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 29, 2000
THOMAS K. KAHN
CLERK

No. 99-8307

_____

D. C. Docket No. 97-03581-1-CV-ODE

PAUL SHIELDS,

Plaintiff-Appellant,

versus

BELLSOUTH ADVERTISING AND PUBLISHING COMPANY, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(September 29, 2000)**

Before CARNES, BARKETT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Plaintiff Paul Shields appeals from a judgment entered against him dismissing his wrongful termination suit against Defendant BellSouth Advertising and Publishing Corp. ("BAPCO") under the doctrine of collateral estoppel. Prior to bringing suit in federal court, Shields sought unemployment benefits through the Georgia state courts. During those state proceedings, a Georgia Superior Court found that there was no record evidence that Shields was

fired because of his protected status as an HIV-positive male. Based on this state court finding, the federal district court dismissed the lawsuit, which alleges wrongful termination on the basis of disability in violation of Title I of the American with Disabilities Act, 42 U.S.C. § 12101, et seq. The district court concluded that the gravamen of Shields's suit -- his allegation that he was terminated because of his HIV-positive status -- already was litigated in his state unemployment benefits proceedings, and that those proceedings offered him a full and fair opportunity for hearing in compliance with federal due process standards. While we agree with the district court that Georgia's unemployment benefits proceedings, on the face of this record, comport with the procedural rigors of federal due process, we are unclear as a matter of Georgia law whether a state court finding, in the context of an unemployment benefits appeal, that there is no record evidence that an employee was fired because of his protected status would estop a subsequent state court suit for wrongful termination on the basis of protected status. Because this unanswered question of Georgia law is determinative of this appeal, we respectfully certify the following question to the Supreme Court of Georgia:

> Under the circumstances of this case, would a Superior Court's finding in an unemployment compensation appeal that there is no evidence the decisionmaker who terminated the employee knew of his protected status and no evidence that his protected status motivated his discharge, collaterally estop the employee as a matter of Georgia law from establishing in a subsequent wrongful termination lawsuit in state court that he was terminated because of his protected status?

I.

On December 14, 1981, BAPCO hired Shields as a Directory Advance Sales Representative. Included in his job responsibilities was the task of soliciting local advertisers for "The Real Yellow Pages." As part of these duties, Shields routinely visited local businesses to

2

discuss advertising programs and rates. On one such occasion, January 17, 1995, Shields became involved in a nasty incident with a customer, Anh Puckett, who owned a local jewelry store. The dispute centered around the fact that Ms. Puckett currently received a free advertisement from BAPCO because of a previous mistake the company had made in her advertisement. Having failed to read her case file, Shields was unaware of this history and proceeded to argue with Ms. Puckett in front of his supervisor, Barbara Karesh, that he could not give her a free advertisement. The argument became heated and Puckett asked Shields to leave the store.[1] Shields then left as Karesh stayed behind to apologize for Shields's behavior. In the midst of her apology, Shields returned to the store and loudly told Karesh, in front of Puckett, "Come on. You are not going to get anywhere with her." Karesh then reported the incident to BAPCO management three days later.

In response, Karesh's supervisor, David Pankey, conducted an investigation in which he concluded that Shields's behavior was "extremely serious, totally inexcusable, and without justification." Shields then was fired on February 10, 1995.[2] BAPCO also demoted Karesh from her manager position for her failure to report the incident immediately. She subsequently resigned.

After his termination, Shields filed a union grievance under the collective bargaining agreement challenging the validity of his firing. On July 2, 1996, an arbitration hearing was held

---

[1]According to the record, Shields threw the rate sheets on the floor in anger and exclaimed, "I might as well throw this out the window." He then apologized but the argument continued until Puckett asked him to leave. At that point, Shields stormed out of the store, stating that he was "not in kindergarten."

[2]While Shields's 13-year employment record was quite good, there was a similar incident with a customer in 1992 for which Shields was reprimanded.

between BAPCO and the union. The arbitrator concluded that while Shields had committed "gross misconduct," Shields's termination was not a reasonable response in light of his long-term, above-average work performance. Shields then received full reinstatement, backpay, and retroactive seniority with BAPCO. He returned to work but voluntarily resigned on August 15, 1996.

In addition to his union grievance, Shields also sought state unemployment compensation benefits from the Georgia Department of Labor ("Department"). Under Georgia law, a terminated employee is entitled to unemployment benefits unless the employer proves by a preponderance of the evidence that the employee was discharged for "failure to follow rules, orders, instructions, or failure to perform the duties for which hired." See O.C.G.A. § 34-8-194(2)(A). On March 1, 1995, a Georgia claims examiner ruled that Shields was entitled to unemployment benefits dating back to February 12, 1995. BAPCO appealed this ruling on March 15, 1995, and an administrative hearing officer held an adversarial hearing on the matter on April 13, 1995. At the hearing, both Shields and Pankey testified and both witnesses were subject to cross-examination. Both sides also were afforded an opportunity to introduce evidence. On April 14, 1995, the hearing officer released a written decision affirming the award of unemployment benefits to Shields.

In his decision, the hearing officer made a number of factual findings with respect to Shields's termination. He found that the incident involved a "very difficult customer," that Shields had an "above-average" employment history, that Shields "had not habitually had any problems with customers that amounted to much," and that Shields's conduct "did not show willful misconduct on his part, but [only] an inability to handle a particular customer who was

4

causing problems." Notably, the officer expressly observed that Shields attributed his termination to the fact that he had contracted the AIDS virus and had been receiving medical treatment since the middle of 1994. This finding was the hearing officer's only mention of Shields's HIV status. However, the hearing transcript makes clear that during Pankey's cross-examination, Pankey had been asked by Shields's lawyer when he had learned of Shields's HIV-positive status. Pankey denied any knowledge of Shields's medical condition.[3]

On April 21, 1995, BAPCO appealed the hearing officer's decision to the Department's Board of Review. The Board affirmed the award to Shields without opinion on July 21, 1995.

BAPCO then appealed the Board's ruling to the Superior Court of Dekalb County, Georgia. After reviewing the hearing transcript and order, the state court reversed the unemployment benefits award to Shields, concluding that the award was "unsupported by any evidence submitted at the hearing below." The state court found that it was undisputed that Shields was "familiar with his employer's rules, regulations, and policies regarding treatment of customers contained in the company's handbook," and that Shields had been disciplined for a similar incident with a customer three years earlier. The state court determined that Shields's conduct demonstrated "willful, intentional disrespect to this client, in contravention of company rules." Addressing Shields's opinion that he was discharged because he had contracted the AIDS virus, the court observed that "while the record does disclose that Shields is HIV positive, and that Shields had taken a medical leave of absence because of his illness, there is no evidence that Mr. Pankey, the sales manager who discharged Mr. Shields, knew that he was HIV positive

---

[3]Several months prior to his termination, Shields had taken a three-month disability leave for HIV-related illness.

or that this fact motivated the company's discharge. In fact, Ms. Karesh was also severely disciplined, and there is no evidence that she was HIV-positive." This passage is the only mention in the Superior Court opinion of Shields's claim of wrongful termination on the basis of protected status.[4] On April 4, 1996, the Georgia Court of Appeals denied Shields's application for discretionary appeal from the Superior Court's judgment.

On November 28, 1997, Shields filed the instant federal lawsuit alleging that his termination violated Title I of the American with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. In his complaint, Shields alleged that BAPCO terminated him because of his HIV-positive status. On June 16, 1998, BAPCO responded by filing a motion to dismiss. BAPCO asserted that Shields's ADA suit was barred under the doctrine of collateral estoppel because Shields already had litigated in his state unemployment benefits proceedings the question of whether he was fired because of his HIV-positive status. On February 23, 1999, the district court granted BAPCO's motion to dismiss, finding that the state court determination regarding BAPCO's discharge of Shields precluded Shields's federal ADA suit.

## II.

We review the district court's ruling on a motion to dismiss de novo. See United States v. Nyhuis, 8 F.3d 731, 734 (11th Cir. 1993). Under our caselaw, we give preclusive effect to the judgment of a state court provided that two conditions are met: first, that the courts of the state from which the judgment emerged would do so themselves; and second, that the litigants had a

---

[4]The Superior Court incorrectly observed that the hearing officer had "found that 'one of the main reasons' Mr. Shields was discharged was because he had contracted the AIDS virus." In fact, the hearing officer made no express finding about the connection between Shields's discharge and his HIV status.

6

"full and fair opportunity" to litigate their claims and the prior state proceedings otherwise satisfied "the applicable requirements of due process." Gorin v. Osborne, 756 F.2d 834, 836 (11th Cir. 1985); see also Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984); Allen v. McCurry, 449 U.S. 90, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).

A.

In this case, Shields has presented no persuasive argument that the procedures used in his administrative proceeding violated federal due process requirements. Georgia's unemployment benefits compensation scheme expressly requires that, if the initial determination regarding benefits is challenged, the parties receive a hearing before "one or more impartial hearing officers." O.C.G.A. § 34-8-220(a).[5] The parties must, by law, receive "reasonable opportunity for fair hearing" prior to the hearing officer making a decision. The parties may then seek an additional layer of administrative review before the Board of Review, at which stage the parties may seek leave to submit additional evidence. O.C.G.A. § 34-8-221(a). Next, the parties may seek judicial review of the Board of Review's decision in the appropriate Superior Court. O.C.G.A. § 34-8-223. The judicial proceeding is summary in nature, but the court may, if warranted, remand the matter to the hearing officer for further factfinding on an issue. See TNS Mills v. Russell, 213 Ga. App. 107, 109, 443 S.E.2d 658, 660 (1994). The parties may then seek a second layer of judicial review from the Georgia Court of Appeals. O.C.G.A. § 34-8-223(b).

---

[5]Under the statutory scheme, a claims examiner makes an initial determination regarding the employee's eligibility for benefits, after which the losing party may appeal that decision by seeking a full hearing. See O.C.G.A. §§ 34-8-190, 192.

7

In accordance with these extensive procedures, Shields received an administrative hearing on his unemployment benefits request which was adversarial in nature and afforded him a sufficient opportunity to pursue his positions. Shields raised the issue of his HIV-positive status during the state proceedings, arguing that BAPCO fired him because of his HIV status rather than because of his incident with Ms. Puckett. Thus, Shields cannot say that he was denied the chance to present the issue he now raises again in this case. Both parties were allowed to call witnesses to testify, to cross-examine witnesses, and to submit evidence into the record. Notably, Shields has not argued that he was affirmatively prevented from calling or cross-examining witnesses or introducing relevant evidence at the hearing. Shields received at least two multi-page written decisions regarding his benefits claim, at the hearing officer stage and again in the Superior Court. On this record, we can find no basis to conclude that the state proceedings denied Shields a "full and fair opportunity" to pursue his wrongful termination claims or otherwise failed to comport with "the applicable requirements of [federal] due process." Goren, 756 F.2d at 836.[6]

B.

That said, we believe the first part of our inquiry -- whether Georgia courts would collaterally estop a wrongful termination claim based on protected status in light of the state court's findings as to BAPCO's termination of Shields -- is more difficult. Under Georgia law,

_____

[6]Shields cites Delgado v. Lockheed-Georgia Co., 815 F.2d 641 (11th Cir. 1987) for the proposition that participating in an administrative unemployment benefits proceeding does not provide an employee with an adequate opportunity to litigate federal discrimination claims. Delgado, however, involved decisions by a state agency that had not been judicially reviewed. Id. at 647 ("we decline to grant preclusive effect to the unreviewed agency determinations"). Here, however, the agency decisionmaking was subject to judicial review. Thus, Delgado does not dictate the conclusion that the procedures afforded here were so inadequate as to violate federal due process.

8

collateral estoppel should be applied when two conditions are met: first, when an action has actually been adjudicated between the same parties; and second, when an issue from that previous action was actually litigated or necessarily was decided for the previous judgment to have been rendered.[7] In this case, though, it is unclear whether under Georgia law the state court's finding that there was no record evidence supporting a conclusion that BAPCO's termination of Shields was HIV-related constitutes a prior adjudication, for collateral estoppel purposes, of the merits of Shields's ADA claim for wrongful termination on the basis of protected status. And we have found no Georgia case directly on point. Although it is true that Shields raised the HIV issue at his administrative hearing, that issue was offered only as a possible alternate explanation for BAPCO's termination motives and was not the focal point of his benefits claim. Simply put, this case turns on a difficult interpretive question concerning

---

[7]As the Georgia Supreme Court has explained:

> Collateral estoppel precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies. Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions. However, unlike res judicata, collateral estoppel does not require identity of the claim -- so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim. Furthermore, collateral estoppel only precludes those issues that actually were litigated and decided in the previous action, or that necessarily had to be decided in order for the previous judgment to have been rendered. . . . Before collateral estoppel will bar consideration of an issue, that issue must actually have been decided.

Waldroup v. Greene County Hosp. Auth., 265 Ga. 864, 866, 463 S.E.2d 5, 7-8 (1995); see also Block v. Woodbury, 211 Ga. App. 184, 185, 438 S.E.2d 413-14 (1993) (finding that "'collateral estoppel . . . only precludes re-adjudication of an issue already adjudicated between the parties or their privies in a prior action'").

9

Georgia collateral estoppel law.

Under our caselaw, "[w]hen such doubt exists as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary state law guesses and to offer the state court the opportunity to interpret or change existing law." Pogue v. Oglethorpe Power Corp., 82 F.3d 1012, 1017 (11th Cir. 1996); see also Mosher v. Speedstar Div. of AMCA Int'l, Inc., 52 F.3d 913, 916-17 (11th Cir. 1995); Sultenfuss v. Snow, 35 F.3d 1494, 1504 (11th Cir. 1994) (en banc) (Carnes, J., dissenting) (stating that "[o]nly through certification can federal courts get definitive answers to unsettled state law questions. Only a state supreme court can provide what we can be assured are 'correct' answers to state law questions, because a state's highest court is the one true and final arbiter of state law."). We therefore certify this question to the Supreme Court of Georgia:

> Under the circumstances of this case, would a Superior Court's finding in an unemployment compensation appeal that there is no evidence the decisionmaker who terminated the employee knew of his protected status and no evidence that his protected status motivated his discharge, collaterally estop the employee as a matter of Georgia law from establishing in a subsequent wrongful termination lawsuit in state court that he was terminated because of his protected status?

We stress that our formulation of this question is not meant to limit the scope of inquiry by the Supreme Court of Georgia. As we have explained previously, "the particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis . . . . This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given. . . ." Martinez v. Rodriquez, 394 F.2d 156, 159 n. 6 (5th Cir. 1968). To assist the Georgia Supreme Court in its determination, the entire record in this case,

10

together with copies of the briefs of the parties, is transmitted herewith.

In sum, with respect to Shields's appeal of the district court's judgment, we find no violation of federal due process, but CERTIFY the state law question of whether in these circumstances Shields's wrongful termination claim based on protected status would be collaterally estopped under Georgia law, and therefore WITHHOLD final decision about the district court's grant of BAPCO's motion to dismiss until we receive the answer to that question.

QUESTION CERTIFIED.